The first case this morning is Toles v. Abbott Laboratories, Case No. 523-1205. Does the clerk need to make an announcement about the courtings? The court will annul your time as being separated. The rebuttal will have to be free instead of 2.5 because the time has changed. So the clerk will keep track of the way the parties have agreed to divide their time on the felon's argument. Counsel Coberly, you may proceed. Your Honor, I thought Mr. Brachofsky wouldn't wait for us. Okay. You may proceed. Thank you, Your Honors. May it please the court, my name is Joel Bertocchi. I represent the Johnson defendants. With the court's permission, I'm going to address personal jurisdiction issues, which are threshold issues that matter only to my clients. Ms. Coberly will address form non-convenience and venue issues, which matter to both of us, if that's okay. I'm going to begin by stating the obvious. We've all been here before. It was back in December when we argued Jupiter before the same panel, and I hope not to march through everything the way I did that day. I know you remember it, and if you don't, there's a recording. But the issues are pretty much the same. There are a few differences, which I will talk about. But it is just as true in this case that there is no general or specific personal jurisdiction over Meade Johnson in these cases. It is just as true here in tolls that Meade Johnson's principal place of business has been, since the end of 2018, in Indiana. The record is clear on that. One of your colleagues, Judge Jenkins, up in Chicago in the federal court made that ruling based on the same evidence in a very similar case. There is no new evidence on that point. I would say, if anything, that issue has gotten better for us because these cases were filed later, well after, years after that move was made. And for that reason, there is the nerve center of Meade Johnson remains in Indiana, and there is no general jurisdiction based on that. The critical point I would remind the court for purposes of general jurisdiction is when the lawsuit is filed. These lawsuits were filed, as I said, years after that happened. What the plaintiffs try to do with their personal jurisdiction arguments is combine general and specific jurisdiction and their different concepts. And I apologize because I noticed in my briefing in this case, I keep using the same metaphor, and I like to pick different metaphors. But when I was here before you in December and in the briefs in Jupiter, I said apples and oranges, and I said it here to you, and I'm going to say it again today. They are trying to combine the look-back features of specific jurisdiction with the where's the company run in general jurisdiction. And Judge Foley in these cases went along with that. He said he relied on the fact that Meade Johnson was once headquartered in Chicago, a period that ended by the end of 2018. And he wanted, and he said that the proper thing to do is to look back to where the company was run at the time it was, at the time of the events in the case. That is trying to create a hybrid form of personal jurisdiction. And as my 20-year-old daughter likes to say to me, that's not a thing. There is no hybrid. The look-back is a feature of specific jurisdiction where it has to be related to the events, the claims in the case. There is no look-back for general jurisdiction. For general jurisdiction, it's when was the lawsuit filed. Plaintiffs continue to rely on Daimler and try to argue that this is an exceptional case. And one of the bases they do that is these forms. Now, again, not to repeat myself, but I guess I'm kind of stuck a little bit. The forms don't matter. And in that respect, I would commend to the Court the Harrison v. Granite Bay case that we cited in our reply brief. It's the First Circuit. Federal court's obviously not binding, but it's a very well-written opinion. And it uses a phrase that resonates with those of us of a certain age. It talks about the fact that one of the new corporate forms, which is all the plaintiffs have ever talked about, are not overcome by the question that really matters for the nerve center, which is where the buck stops. Some of us who are history buffs know who popularized that phrase in the first place, but that's really what matters. And the Harrison v. Granite Bay case, the facts of that case are worth spending a minute on, because they really emphasize the importance of the nerve center in general jurisdiction, in principle place of business analysis. The Granite Bay Company was a company that was owned by two people, and they lived and worked in Concord, New Hampshire. They were the directors and the officers of the company, and the only ones. But all of the company's operations, everything it did was in Maine. And there was actually a manager who worked for them in Maine and ran the Maine operations. Still a New Hampshire company. Everything that company did, it did in Maine. But the two people where the buck stops were in New Hampshire, and so that was considered a New Hampshire company in terms of its principle place of business. Those operations did not matter. Now, the forms in this case, the argument about the forms for the plaintiffs is even worse, because by the time these cases were filed, the forms that they relied on in Jupiter, which, again, don't determine anything, but the forms had been corrected. And, in fact, we had been denying Illinois as our principle place of business in pleadings in Jupiter all along, but they nonetheless persisted in filing here. Plaintiffs talked in terms of their forms discussion about other cases, a couple of other states. They cited, I think, five states, Arkansas, Alabama, Arizona, Idaho, and Maryland. Well, they were wrong about three of those, and we don't know about the others, because if you look at the actual filings, and we have links for those in our reply brief, they all say Indiana. But I keep coming back to this, the forms don't matter. I don't know whether Mr. Keller will talk about it again today, but in their briefs they talk about Mallory. And Mallory is not relevant to this case. Aspen is relevant to this case. Last time we were here, I pleaded with you to read Aspen. I'm sure you will. Maybe you'll read it again. But Aspen talks about the Illinois statute, and it talks about it only as an Illinois, as the text of the Illinois statute. There is no conditional language in there that says, oh, if the Constitution was something else, we would say something, you know, we might say something different. What the Mallory argument is asking you to do, that the plaintiffs are making, is believe two things that make no sense. First, they are asking you to believe that the Illinois Supreme Court would decide Aspen insurance based on a belief that a Supreme Court of the United States case, Pennsylvania fire, had been overruled sub salientia. The Supreme Court of the United States had never said that. As Mr. Keller argued successfully there, it hadn't been overruled. But he's asking you here to believe that the Supreme Court of both of the Supreme Court of the United States somehow overruled it without saying so, and that if the Aspen-Illinois Supreme Court believed that, they would just believe it but not say anything about it. There's no way the Aspen opinion would look like that if they were right about Mallory. With regard to specific jurisdiction, it begins and ends with reams. I went through this. I'm not going to go through it in detail. Would you repeat that? Specific jurisdiction question in this case begins and ends with the Illinois Supreme Court's decision in the Rios case. Okay. And, again, I went through it in considerable detail last time. The thing that I would ask the Court to remember about Rios is that the facts of Rios, the connections to Illinois and Rios between the claims and the product that was challenged in Rios and Illinois were stronger than this case. The plaintiffs in Rios cited clinical studies that the Bayer Company, the defendant, performed in Illinois that said of the product challenged in that case. They cited marketing of that product. Illinois Supreme Court said not enough. Here they don't have that. The clinical studies they cite were for other products. Enfamil is what this case is about as far as Meade-Johnson is concerned, and there is no, there are no clinical studies of Enfamil in Illinois. The studies that they cite aren't really even Illinois studies anyway. They had some Illinois activity, but as with a lot of big companies, there were studies everywhere. But under Rios, it's just not enough of a connection. Finally, I would remind the Court that even if it concludes that there is jurisdiction under the specific or general test, there is an unreasonable test in this test in the due process that the due process clause requires. So even where jurisdiction can be exercised, you can look at it and say it's still unreasonable. And we've made arguments about that in the brief. I won't repeat them. These cases have no relationship to Illinois except that the plaintiffs want to be here, or their lawyers want to be here. I don't know. Ultimately, Your Honors, what they are arguing for on personal jurisdiction is universal personal jurisdiction in Illinois, in St. Clair County, I suppose, for every case involving a big company that has national operations. Every case about every subject. And that just is not the law. If there are no questions for me, I will yield back the remainder of my time to either you or Ms. Gulliver, whoever gets it. Okay, counsel. Your co-counsel will then have the remainder of the other 10 minutes. I will note for the two of you that are dividing your rebuttal time, we don't have the ability with our timer to divide it into two and a half minutes, so you'll each get three. Very generous, Your Honor, although I don't prepare two and a half. I don't know why. Thank you. Good morning, Your Honors, and may it please the Court. I'm Linda Coberly, and I represent Abbott Laboratories. I'm going to be addressing the venue and forum nonconvenience arguments which matter to both defendants. The case that this panel heard in December came out of Madison County, where the Plaintiffs' Counsel has filed many, many, many infant formula claims on behalf of a large number of plaintiffs. Not one of those claims has anything to do with Madison County. But Plaintiffs' Counsel has done the same thing in St. Clair County, which brings us here today. Do you know how many cases were filed in each county? Your Honor, I actually don't know that off the top of my head, and here's why. What I can tell you is that there are thousands of individual plaintiffs in each county, more in Madison than in St. Clair. Individual complaints, we think to avoid paying filing fees. What counsel's been doing is paying one filing fee for the complaint, but including many, many plaintiffs on the complaint. So it's a little difficult for me to tell at any moment how many cases there are. But I can tell you that there are close to 10,000 plaintiffs in the Madison County cases and close to 1,000 plaintiffs in the St. Clair cases. Thank you.  So the same analysis applies across the two appeals. For every one of the claims before this Court, no relevant events took place in the forum. No relevant product was manufactured or labeled or tested or sold in the forum. No evidence exists in the forum. No witness or party lives there. There is simply no connection whatsoever between the claims that are before the Court and the counties where they were filed. And I'll start with the venue issue, which this Court reviews de novo. The Circuit Court's order starts by concluding that Abbott is subject to venue in St. Clair County for any claim that arises anywhere, simply because of an unmarked roadside storage locker rented by a sales representative. That storage locker, according to plaintiffs and the Circuit Court, is a corporate office of Abbott and subjects Abbott to suit in St. Clair County on any claim of any kind, no matter where it arose. Abbott paid for the storage locker, correct? Abbott reimbursed the sales representative for the business expense of renting a storage locker in his own name. So it's not unlike, Your Honor, I stayed in a hotel last night, and I will be submitting the expense for my hotel room to Abbott Laboratories. And I will, I hope, be reimbursed for it. But that does not make my hotel room an office of Abbott, even though I did work there in the room last night. The storage locker was rented by, and the evidence about this, by the way, is uncontroverted. The storage locker was rented by the sales rep in his own name. He was personally bound to the lease, and he did not bind Abbott to the lease. He chose its location unilaterally. He was the only one involved in it. And he testified in a hearing that if he stops working for Abbott, he's still bound to the lease. It is his personal storage locker. Now, it's true that Abbott told him, please make sure, we require you to make sure that you have an appropriate refrigerated place to store your samples. He could have done that in his garage. He could have done that in a storage unit in Missouri where his territory was. It would have actually been closer to most of his customers if he'd done that. He chose unilaterally to do it near his home, which is in St. Clair County. So the test, Your Honor, is whether the corporation purposely selected the storage locker as a fixed location to conduct corporate business. And the answer on these facts is simply no. Now, the plaintiffs and the circuit court tried to avoid that problem by saying that the sales rep was an agent of Abbott when he rented the storage locker. But there's no legal basis here to say that a single sales rep, one out of 100,000 employees at Abbott Laboratories, is authorized to bind Abbott Laboratories to a lease agreement or to decide unilaterally where to open an office of Abbott. In fact, the proof shows and the testimony of this sales rep shows that he did not understand himself that he did not intend to open an Abbott location. He simply intended to find a place to store his supplies. He signed the contract himself. It was a personal contract to rent a personal storage unit. He did not put a sign on it. That location was never advertised anywhere by anyone. And he listed a personal friend as the emergency contact, not his manager, not someone from Abbott, a personal friend. The evidence is uncontroverted. The lessor of that storage unit was the sales representative himself, not Abbott Laboratories, the corporation. And there's certainly no evidence that Abbott Laboratories chose where it should be. There's also no legal basis to find ratification here. We've talked about the reimbursement of the expenses. He submitted the expense for reimbursement. And although he used an Abbott credit card, he explained all of this in the hearing in front of the circuit court. He explained that that credit card is simply a way, it's an easier way to get expenses into the expense management system at Abbott Laboratories. He could have used his personal credit card. He happened to use his Abbott credit card. And then he had to go on to the system and register that expense as one for which he was seeking reimbursement. It's no different than any other business expense. And there's no reason to think that either the sales rep or Abbott itself believed or intended that this unmarked storage unit at the side of a road would be a corporate office of a Fortune 500 company in St. Clair County. If these theories were right, these theories about the storage locker and ratification and agency, then the Taberta case would have come out the other way. In Taberta, Taberta was about an employee in a home office. And the employee in Taberta worked mainly out of his home, unlike the sales rep in our case who worked on the road. And he was the employer's agent for some purposes, just like a sales rep is an agent of the employer to make a sale. But the Supreme Court still said that the residence was not a corporate office because the corporation didn't purposely select it to be a fixed location for corporate business in the county. The very same analysis applies here. And Taberta requires this Court to reject this storage locker theory that plaintiffs have asserted. Same for the home office. The Court concluded that Abbott has an office in St. Clair County because one of its sales reps chose to live there. But Abbott proved, first of all, that the sales rep does not work from a fixed location at all. Yes, he answers the phone at home. Sometimes we all do. Sometimes we answer our e-mails at home. But that's not a person, that does not reflect a purposeful choice by the employer to establish a fixed place of business in St. Clair County. There's been a lot of ink spilled about whether the residence played a role in his hiring. And there's no need to disturb any factual finding by the circuit court on this issue. Even if he was hired in part because he lived in O'Fallon. He also explained what that meant. He meant when he said that he was hired in part because of his employment, because of his residence, what he meant was, and he explained this, that his managers look at a map as to where territories are. And they want people to be either in them or near them. His territory covers St. Louis East. The lion's share of it is in Missouri. He could have lived in Missouri or anywhere as long as he was near his territory. It's just like in Taberta, which says it doesn't matter if the employee's proximity to customers played a role in his hiring. On the doing business prong, Your Honor, we and Meade both proved that neither defendant does anything to locate its operations in St. Clair County in particular. We proved this different ways. We both put in affidavits saying that we don't have operations offices, any targeting of our operations to St. Clair County. When it comes to our sales figures, we also put in evidence of that. We proved it different ways. But we made the same point, which is that sales for both of these very, very large companies in St. Clair County are de minimis compared with the sales as a whole. So there would be no basis to pull all of the company into a venue in St. Clair County. There's simply no legal basis under the venue statute for that conclusion. Thank you. Thank you, Counsel. Any questions? No questions. If you'll have an opportunity for rebuttal. Counsel for Appley. Good morning, Your Honors, and may it please the Court. Ashley Keller on behalf of the plaintiffs. I'm going to start with venue informed on if it pleases the Court, and then in terms of personal jurisdiction, which, as my colleague said, is unique to Meade. And I'd like to begin with something that I don't think you heard over the course of the last 18 minutes or so, which is the appropriate standard of appellate review. And on the one hand, I can't blame my colleagues for not bringing that up. It's obviously a difficult standard for them, especially coming after 100 pages of careful analysis from the circuit court. But on the other hand, we can't escape that this Court is not deciding these issues de novo. So on questions of fact, this Court reviews what the circuit court did under the manifest error standard. And on questions of equitable discretion and forum non, this Court reviews for abuse of discretion, and it can only disturb the circuit court's finding if no reasonable jurist could reach the same conclusion. So you're obviously not painting on a white canvas here. Another issue that I think comes up, and your honors are experienced and have seen this many times, when the standard of review is difficult for the losing party, they often try and blur the line between questions of fact and questions of law so they can sneak in a de novo standard. So let's be really clear turning to venue on whether the questions of fact, indisputably under this Court's precedent. So first and foremost, whether a location is fixed and permanent or not is obviously a question of fact. Counsel, where are there facts in this record that Abbott purposely selected the sales rep's residence as its office? So with respect to the decision to hire the sales representative, there are facts, testimony from the sales representative himself that the circuit court heard and made a judgment call on saying that Abbott deliberately selected him for this position in part based on his location. Isn't it true that if your sales rep moved to Clinton County, he'd still be working for Abbott? It is true that he would still be working for Abbott. But there are no facts on this record as to whether Abbott would have tolerated someone moving to Clinton County or not. But the initial decision whether to hire this sales representative turned in part on his location in St. Clair County. But it's actually even stronger factual evidence with respect to the storage locker, which is, to my mind, the easiest ground for you to affirm on the venue decision for. The circuit court said that Abbott instructed him as their agent to go find this facility. And it wasn't a personal facility, even though he put his own name on it. It's not like he was storing his baseball card collection there. Is there any facts in the record that Abbott said find this storage locker in St. Clair County? The evidence is that Abbott instructed him to find a storage locker. He had some discretion as to where he was going to select to pick that storage locker. But the scope of the principal and agent relationship is another question of fact that has to be reviewed for manifest error, which there clearly isn't in this record. And it is also a question of fact whether a principal has ratified the decision of an agent. And here there's a very clear finding of fact from the circuit court that Abbott was immediately made aware of this particular storage locker, not just one generally somewhere in the vicinity, but this particular one. It was paid for on Abbott's credit card. So Abbott's the one paying the bills. It's not the same thing as submitting for reimbursement when you stay one night at a hotel before an oral argument. This is an ongoing expense of the corporation. And the circuit court made a finding that the principal, Abbott, ratified the decision of its agent, Willis. And that can't be disturbed unless it's manifestly erroneous. There was testimony that suggested that Abbott was made aware immediately of this purchase. And that simply had been a ratification for the fact that you did what we told you. You ran a storage locker. We don't care where. And we certainly didn't intend for you to find us to a principal place of business where you picked that location as opposed to Clinton County or St. Louis. Respectfully, Your Honor, I don't think that that's the task. This is certainly not the principal place of business of Abbott. We're not trying to argue that Abbott opened his principal place of business where it was storing dialysis equipment in a storage locker. But Abbott deliberately allowed a facility of Abbott, an office of Abbott, to exist in St. Clair County. They may have initially been indifferent as to whether it was right over here on the map versus right over there, but that's completely different from the Tiburta case. If they then see, okay, our agent went out and picked this exact facility to store our equipment to further the purposes of Abbott. Again, this is not an employee storing his own personal items there or mixing and matching personal and corporate items. The sole purpose of this facility was to provide temperature control for sensitive equipment that then this employee was utilizing to go make sales for Abbott. Abbott was made aware of exactly where that facility was and ratified the decision. Ratification means purpose. That is the principal exercising its authority to say we accept that this is going to be something that we are going to pay for on an ongoing basis. So I do think that that is enough to establish an office of Abbott in St. Clair. And once you have that, venue is open and shut for both defendants. So this is an important point under the statute. The first sentence of Section 2-101 is very clear, that if there is residence as to any defendant, venue is proper. And so... I guess my question is simply this. What is your argument that Tiburta is not dispositive of this issue? My argument that Tiburta is not dispositive of this issue is that Abbott here, based on the factual findings of the circuit court, deliberately selected this facility. They accepted that this facility in this location was going to be a facility of Abbott. But what if the facts in Tiburta and the holding in Tiburta support the conclusion that the circuit court's findings were wrong? They were against the manifest way to the office. There is no finding in Tiburta from the circuit court that the corporation purposefully selected that home office. They agree that it's an office. They just say that the corporation didn't select it. Here you have two independent bases that are factually grounded in the record to support that finding. You have a principal-agent relationship where the circuit court finds as a matter of fact that Abbott instructed its employee, its agent, to go rent this particular facility. And you have the independently sufficient factual finding that Abbott ratified that choice. You have none of that in Tiburta. There are no findings in Tiburta from the circuit court on a principal-agent relationship or on ratification. So unless you blur the line between fact and law and say the existence of a principal-agent relationship or the ratification are not findings of fact, which they clearly are, I think this record is distinguishable. So once you accept that, again, it's open and sharp under the first sentence of 101 because any defendant has residence in St. Clair. And it's important to note, for your honors, though Abbott is the one that has the office in St. Clair, on every complaint that's in front of you that lists Meade-Johnson, Abbott is also a defendant. So once Abbott is properly residenced in St. Clair, venue is proper as to Meade as well. I do want to touch on foreign nonconvenience for a moment. Even though I don't think my colleague got to it, this will give her the opportunity if she wants to spend some time in rebuttal. Again, this is reviewed for abuse of discretion. You have to determine whether any reasonable jurist could reach the same conclusion as the circuit court. And once again, just as we were arguing with respect to the Madison County claims that were in front of you several months ago, my friends on the other side are ignoring that these are often multi-plaintiff complaints. And your precedent from Byrd is clear. When you evaluate a foreign nonconvenience motion where they bear the burden, by the way, of establishing a clear right to equitable relief, the plaintiff has to show or the defendant has to show that the form is inconvenient to them and that there is another form that is more convenient to all of the parties. They can't ignore the other plaintiffs on this complaint. They say that we're filing multi-plaintiff complaints to save our plaintiffs money, which, by the way, is partially true. But nevertheless, we have a right to file multi-plaintiff complaints. The complaints that are in front of you involve multiple plaintiffs, and you have to look at the convenience to all of them, not just one particular plaintiff vis-a-vis a defendant. They say they want these cases sent to where the infant child was born. That's not one place on a multi-plaintiff complaint. So let's look at Lavorsi, for example, who is in front of you, which I believe is the only foreign non-motion that involves both Abbott and Meade-Johnson. So the Lavorsi child, Vincent, was born in Naperville, Illinois. But also on this complaint is a child that was born in Louisiana. And also on this complaint was a child born in Memphis, Tennessee. And also on this complaint was a child born in Kentucky. They don't do any analysis vis-a-vis all of those other plaintiffs and the non-party witnesses that are going to have inconvenience to them if this action is transferred. So you can't say that it's an abuse of discretion, and the circuit court hasn't properly analyzed this such that no reasonable jurist could reach the same conclusion as the circuit court judge when they're not even factoring in all of these other parties. They say that nobody on these complaints are from St. Clair. That's not true. The Washington plaintiff is from St. Clair County. So you have someone on the Brown and Florence complaint, also in front of you, who is actually residenced in the county where they say that these cases ought to go based on where the child was born. So their analysis is quite incomplete, and it's difficult to find an abuse of discretion from the circuit court when they're not even telling this court where these actions should go. Fair nonconvenience involves a comparison between the county that the plaintiff selected and some alternative venue. If they say send this case to where the child was born, and that's multiple different places, sometimes in completely different states, it's very difficult for the circuit court to do an analysis based on that. The circuit court here made findings that there are witnesses all over the place, including in multiple different states, and so in light of that, none of the factors cut strongly in favor of moving to the defendant's preferred venues. That finding can't be disturbed, I think, under the appropriate abuse of discretion standard. Let me quickly turn to personal jurisdiction, which, again, is an issue unique to Meade-Johnson. So we've heard a lot about the nerve center test, which comes from the United States Supreme Court's decision in Hertz. As we point out in our papers, the nerve center test is actually about subject matter jurisdiction. It's interpreting the words of 1332, the diversity jurisdiction statute, which obviously is not something this court typically has to grapple with, because you have subject matter jurisdiction over claims regardless of whether they're federal in nature or they're state law in nature. So the nerve center test isn't actually the relevant test for personal jurisdiction purposes. But let's put that to one side. Let's actually accept their framing that the nerve center is what matters, where the key decision makers were, as my friend said, where does the buck stop, to quote Harry Truman. The buck stopped right here in Illinois through 2018. That's not disputed. That is where their nerve center was. That is where their key executives were. That's where the buck had to stop. The decisions were made from Illinois. It is not mixing and matching general and specific jurisdiction to focus on where the key decision makers were located that led to the injuries specifically for these plaintiffs. That is a specific jurisdiction appropriate analysis. And the Ford Motor case from the United States Supreme Court lays out the most relevant test. It's a recent case that says specific jurisdiction is proper where the conduct of the defendant that gave rise to or relates to the plaintiff's injuries occurred. Let's look at the claims here. The main claims are design defect and failure to warn. What's a design defect claim? It's saying that a product was made in an unreasonably dangerous way. Where was the decision made to choose the design of these products to include cow's milk product in something that's going to preterm infants? By their own admission, the nerve center of Meade Johnson was in Illinois. So until 2018, the design decisions about what to do with this fortifier, not some other products, not products that are unrelated to the injuries of these specific plaintiffs, the actual products that these plaintiffs consumed, the design decisions for those products were made in Illinois. That is a classic example of conduct within the forum that gives rise to specific jurisdiction. Let's look at failure to warn. What's a failure to warn claim at bottom? It's not apprising consumers of information about reasonable risks that are known to the defendant. Where was the decision made to put the label on these products that did not contain a warning about necrotizing enterocolitis? Based on their own admission, the nerve center test, the key decision makers who decided to evaluate the studies, whether they were conducted in Illinois or outside of Illinois, and to say, you know what, these studies do not give rise to enough for us to warn pregnant mothers and nursing mothers about the risks of NEC, they made that decision right here in Illinois. The label of this product was chosen in Illinois all the way through 2018. So the plaintiffs who were injured by those decisions, specific decisions that led to their specific injuries, all are related to contact tests that happened by key decision makers in this state. So the fact that they moved later and they say, you know, we changed our forms and we did this and we did that and we eventually became a nerve center in Indiana doesn't change the fact that for the relevant period of time when all of the key decisions were made about this dangerous product and the failure to apprise consumers as to the risks associated with that product happened in Illinois. That's a classic case of specific jurisdiction. We're not asking you, of course, to blinker Rios and the Illinois Supreme Court. The Rios case turned on general form contacts. That was the true mixing and matching of specific and general jurisdiction. The plaintiffs in Rios said, well, some doctors were trained in Illinois and we did some marketing. The defendant did some marketing in Illinois, but it wasn't the specific doctors that ultimately treated those patients. It wasn't marketing necessarily even related to the defective product. And so the court said in Rios those types of contacts might make it not unfair to hail the company into Illinois. It's not going to flunk the reasonableness of due process. But those are not specific contacts in the form that led to the plaintiff's injury, so you can't utilize that to establish specific personal jurisdiction. But that's the mixing of apples and oranges. We're here saying if you accept their premise that the nerve center of their operations was right here in this state, which nobody disputes up until 2018, then that means the buck stops with the decision makers at the nerve center, and they were the ones who ratified or chose to engage in the conduct that led to all of the plaintiff's injuries. Let me quickly conclude with the reasonableness test that my friend very briefly brought up. Meade Johnson is part of a $45 billion company. It has global operations. It is certainly national in scope. The reasonableness prong has never been utilized to prevent a company of that scope and size from being hailed into a sovereign's courts. That does not mean that you can hail a company of that size into a sovereign's courts for anything under the sun. It doesn't mean general jurisdiction for all. That is not what I'm saying. Just because you're a Fortune 100 company, it doesn't mean you are automatically subject to personal jurisdiction in Illinois or anywhere else. But under the reasonableness prong, which is sort of a fail-safe to say, hey, even if you satisfy the minimum contact standard, even if you satisfy the other due process requisites, this is going to be a way for us to say, you know what, this is too unfair for this particular business, probably a small business, a mom and pop. We're not going to hail you into the sovereign's courts. That was not meant for a company of Meade Johnson's size and scope. If Your Honors don't have any further questions, I'll see you at the back. Does venue, proper venue for Meade Johnson depend upon finding that there's proper venue for us? It does not. Your Honor, the circuit court gave five independent grounds for venue, and we really only talked about two, the home office as well as the storage facility. If you thought those were the only grounds to establish venue and you didn't like the other three that the circuit court established, then, yes, Meade Johnson's venue being proper would hinge on Abbott because any defendant can establish proper venue if there's residence. However, there are separate findings from the circuit court that Meade Johnson localized its business through the WIC program, and there's a finding from the circuit court that Meade Johnson failed in its burden of proof since it ultimately bore the burden to establish improper venue by not providing sufficient sales data. So those would be independent grounds to establish venue over Meade Johnson, but based on the things that we primarily focused upon, yes, Meade Johnson's venue is grounded on Abbott properly being a resident of St. Clair. Thank you, Your Honors. Any other questions for the Justice? Okay. Thank you, Counsel. Please follow up. Thank you, Your Honors. Before I go on to personal jurisdiction, I want to spend a moment on what Mr. Keller finished up on in the court's question. It kind of makes you wonder where it all ends. If we can have venue in St. Clair County because an employee of a co-defendant obviously picked a location, and that brings us in, you kind of wonder where it's going to end. But there is, to go on to his additional points, there is no evidence that we localized our business. And if we, if by doing business in a place where we do business all over the place, localized, the word localized in these cases means something else. It means what we're doing there is different than what we do everywhere. And we put in a lot of evidence, which was not disputed, that what we do in St. Clair County is no different than what we do elsewhere, except in Evansville, Indiana. We have a factory in Michigan. We have offices in New Jersey. There are places where we have localized the business. But there is no evidence that St. Clair County is one of those places. Along with personal jurisdiction, Mr. Keller mentioned the standard of review for venue for nonconvenience. The standard, I would remind the Court, for personal jurisdiction is de novo. Judge Foley doesn't get any deference. His nerve center argument, it's nice that he's finally recognized that as of 2018, the buck stopped in Indiana. But all, he is still mixing. He is still trying to use the general jurisdiction, where does the company run, and mixing it with the look back of specific jurisdiction. There is no evidence in this record that the people in the C-suite, who were there until 2018, made any decisions about this. The evidence is that the company was founded in Evansville. The scientific, I think we use the phrase, the scientific hub. The people who decide what the ingredients are. The people who decide where the warnings, what the warnings should say, and on what packages they go. Are and have always been in Indiana, including during that nine year or so period, when the CEO and the COO and the general counsel were in Illinois. So Mr. Keller says, well, those guys are making the decision. The evidence is to the contrary. Again, it's mixing, but even if you could mix like that, even the Illinois executives were not making the decisions that led to what went into these products. I come back to Rios again. The contacts in Rios were far stronger than the contacts. Mr. Keller says they're general contacts. Well, the stuff they talk about marketing, they talk about clinical studies of other products. That's a pretty general contact when you apply it to this case. But Rios decides specific jurisdiction in this case because what they rely on is just not enough. Finally, well, White's on, so finally I'll defer. Thank you.  Thank you, counsel. Both counsel and Rebubble. Thank you, Your Honors. The Court does review venue de novo, and there's no need to disturb any factual findings to get there, whether there's a factual basis here to find purposeful selection or agency or ratification. Those are questions of law, not fact. And the conclusions of the circuit court are just wrong on those issues. But even if you consider them fact, they're also manifestly erroneous. Now, with respect to a couple of specific factual points, counsel said there's no evidence in the record about what would have happened if the sales rep has moved. That's not correct. That issue is addressed specifically in an affidavit at page SR 0840 of the supplemental record. I also heard that there's no evidence that the credit card was just a tool for expense reimbursement. There is testimony on that issue as well that supports what I described about it, and that's at SR 1138. TABIRDA is dispositive here. It's dispositive. The reason both Abbott – I want to address for a second this idea of venue for one is venue for both. The reason both Abbott and Meade-Johnson are on all these complaints is because of how the plaintiff has elected to randomly group different plaintiffs together who have nothing to do with each other. And I think I heard counsel admit just now that the reason they're doing that is to minimize filing fees, and it has cost the Illinois judiciary, at our last count, more than $1.8 million. But setting that practice aside, the plaintiff can't use that kind of creative pleading to avoid the venue statute or the Illinois Supreme Court's authority on forum nonconvenience. And on forum nonconvenience, even – and we ask that the court go on and decide this issue, if you will, even if you rule in favor of us on venue. The Illinois Supreme Court has instructed courts that it is unfair to impose jury duty on residents of a community who have no connection to the litigation. That's the Fennell case. The Illinois Supreme Court has also instructed that Illinois courts have an interest in not being burdened with applying foreign law in the absence of strong policy reasons and a strong connection to the case. That's the Gridley decision. And it's undisputed here that foreign law, the law of the state of treatment, would govern the claims of each infant. We've also presented a lot of evidence about the unavailability of third-party witnesses. My client just had a trial in Missouri, and we called a treater live. We called him live because we were in his home community, and we were able to do that. Can't you use Zoom? We can use Zoom. Well, we could, Your Honor, but even the Illinois Supreme Court, in its most recent rules – and we cite this in our brief – has commented that live testimony still matters. And we should be entitled, when there's not a compelling reason to require us to use Zoom, we should get to choose whether a really critical witness, like the treater who actually chose and used the product here, appears in person. That's a right that belongs to the defendant, and it shouldn't be deprived simply because the plaintiff chose to file the case in a place that has nothing to do with the claims. And again, the big argument I've heard again and again from the plaintiffs is that there are scattered witnesses because, for example, the Lavorsi infant from DuPage was grouped together randomly with an infant from Tennessee. Well, I think this proves the point. The Lavorsi infant, that case started in Cook County. It was voluntarily dismissed and refiled in St. Clair County and randomly joined with a plaintiff from Tennessee with no connection between one and the other. A plaintiff can't be allowed to manipulate the venue inquiry or the form nonconvenience inquiry by randomly joining unrelated plaintiffs into a single complaint to avoid filing fees. Your Honors, there are real costs to what the plaintiffs are doing here. There are serious costs to the judicial system, to the local residents who are going to have to sit for jury duty on a case that has nothing to do with their communities for hundreds of cases, actually, to the defendants in terms of fairness and to the rule of law, which requires taking the statutes and the precedents of this State seriously. We ask the Court to rule both based on venue and based on form nonconvenience that the cases cannot proceed where they currently are. Thank you. Thank you, Counsel. The Court will take the matter under advisement and issue its decision in due course.